******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE ADELINA A.*
(AC 38947)

DiPentima, C. J., and Alvord and Pellegrino, Js.

*Argued September 7—officially released October 11, 2016***

(Appeal from Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, Olear, J.)

*David J. Reich*, for the appellant (respondent mother).

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon* and *Michael Besso*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent mother, Kristina D., appeals from the judgment of the trial court terminating her parental rights with respect to her daughter, Adelina A., pursuant to General Statutes § 17a-112 (j).[1] On appeal, the respondent claims that the trial court violated her substantive due process rights, as guaranteed by the fourteenth amendment to the United States constitution, by failing to (1) consider whether there was a less restrictive permanency plan available to "safeguard" her daughter than termination of her parental rights[2] and (2) require the petitioner, the Commissioner of Children and Families, to "prove, by clear and convincing evidence, that there was no less restrictive" permanency plan than termination of parental rights. We determine that the record to support the respondent's constitutional claim is inadequate for review. Accordingly, we affirm the judgment of the trial court.

I

The following facts are undisputed or were found by the court by clear and convincing evidence. On July 27, 2013, at the age of six months, Adelina was placed by the agreement of the family and the Department of Children and Families (department) with her paternal grandfather and his fiancée, Monica,[3] after Adelina's parents were arrested for using heroin in her presence. On September 19, 2013, the petitioner filed a neglect petition after the respondent and Adelina's father refused to cooperate with substance abuse evaluations. On December 5, 2013, the petitioner sought, and was granted, an order of temporary custody after the paternal grandfather was determined to be using heroin and abusing prescription drugs. On December 10, 2013, the paternal grandfather and Monica filed motions to intervene, but the motions were denied without prejudice.

On March 24, 2014, Adelina was adjudicated neglected. That same day, the paternal grandfather and Monica renewed their motions to intervene, but, on March 31, 2014, the court denied the paternal grandfather's motion with prejudice because of his drug abuse and denied Monica's motion without prejudice because she resided with him. On April 1, 2014, Adelina was committed to the custody of the petitioner. Monica and one of the respondent's cousins continued to make efforts to intervene and become placement resources for Adelina, but by the fall of 2014, both relatives had indicated that they no longer wanted to be placement resources. At that time, the respondent and Adelina's father did not identify any additional relatives for placement, and Adelina continued to live with her legal risk foster family.[4] On January 28, 2015, the petitioner filed a petition to terminate the respondent's parental rights.

In the summer of 2015, the respondent's half brother, Victor, and his wife, Samantha, expressed their interest

in becoming licensed foster parents for Adelina to the department. The respondent also indicated in her pretrial memorandum, dated July 6, 2015, that she would consider consenting to the termination of her parental rights if "a meaningful agreement for an open adoption can be reached or in the event that her brother, [Victor], is granted custody of Adelina and is ultimately able to adopt her." The department elected not to disrupt Adelina's current foster placement and not to pursue licensing Victor and Samantha. The department reasoned that because Victor and Samantha had not maintained any relationship with Adelina since her removal from her parents when she was six months old[5] and Adelina had bonded with her current foster family, with whom she had resided since November, 2014, it was not in her best interests to have her placement altered again. The department encouraged Victor and Samantha to be a family support resource for Adelina, and they have visited with Adelina on a monthly basis. However, Victor and Samantha never filed a motion to intervene in this matter, and the respondent never filed a motion to transfer guardianship to them.

On January 5 and 6, 2016, a trial was held to determine whether the court would grant the petition to terminate the respondent's parental rights.[6] The respondent did not present any evidence concerning the viability of granting permanent guardianship to Victor and Samantha as an alternative to terminating her parental rights.[7] However, during the trial, there was testimony from various individuals concerning Adelina's relationship with Victor and Samantha and the fact that Victor and Samantha had previously expressed interest in being placement resources for Adelina. Samantha also testified that she and Victor were still interested in being resources for Adelina.

The respondent stated her preference for Adelina to be placed with Victor and Samantha during the trial as well. During her testimony, the respondent acknowledged that "[Adelina] would be best off with a family member, preferably my brother and his wife, Samantha . . . ." During closing argument, the respondent's counsel also argued that, although the respondent was "not independently prepared to parent," termination was "not necessary because the evidence shows that she has family supports of her own that allow the child to, in fact, have stability and permanence within her own biological family."

On January 22, 2016, the court granted the petition to terminate the respondent's parental rights after finding that inter alia, a statutory ground for termination existed pursuant to § 17a-112 (j) (3) (B) and that termination was in the best interests of Adelina. In a footnote in its written memorandum of decision, the court addressed the respondent's stated preference that Adelina be placed with Victor and Samantha. The court

first noted that "[t]he only matter before the court is the [termination of parental rights] petition. No motion to revoke or transfer guardianship was filed and remained pending. As has been intimated throughout this memorandum, the evidence was clear that [the respondent] acknowledges she is not [in] a position to have Adelina reunified with her at any time soon."

The court went on to acknowledge that the respondent's "desire is for Adelina to be placed with relatives." The court reviewed the unsuccessful efforts to place Adelina with the paternal grandfather, with Monica, and with the respondent's cousin. It also discussed how the respondent "belatedly suggested placement of the child with Victor and Samantha" and why the department decided not to disrupt Adelina's foster placement. The court concluded: "It is unknown and irrelevant if Victor and Samantha would have been approved for a foster care license due to [Victor's] past history.[8] The issue of placement of the child is not before the court. '*Where* [a child] should reside and *with whom*, however, are not questions that relate to whether it is in [the child's] best interests to terminate [her] relationship with [her] parents.' (Emphasis in original.) *In re Denzel A.*, 53 Conn. App. 827, 834, 733 A.2d 298 (1999)." (Footnote added.)

This appeal followed.

## II

On appeal, the respondent claims that the trial court violated her substantive due process rights, as guaranteed by the fourteenth amendment to the United States constitution, by failing (1) to consider whether there is a less restrictive permanency plan available to safeguard Adelina's well-being than termination of parental rights and (2) to require the petitioner to "prove, by clear and convincing evidence, that there was no less restrictive" permanency plan than termination of parental rights. The petitioner responds that the record is inadequate to review the underlying constitutional claim. We agree that the record is inadequate for review.

Because the respondent did not preserve her due process claim at trial,[9] she seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). "Under *Golding*, a [party] can prevail on a claim of constitutional error not preserved at trial only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [party] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the [party's] claim will fail. The appellate tribunal is

free, therefore, to respond to the [party's] claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Dixon*, 318 Conn. 495, 511, 122 A.3d 542 (2015).

"An appellant [that] has not preserved her claim before the trial court must overcome hurdles that are not imposed when the issue was properly presented to that court." *In re Azareon Y.*, 309 Conn. 626, 635, 72 A.3d 1074 (2013). As our Supreme Court "repeatedly has underscored . . . '*Golding* is a *narrow exception* to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court.' " (Emphasis in original.) Id. The court will review an unpreserved constitutional claim on appeal "only if the trial court record is adequate for appellate review." (Internal quotation marks omitted.) Id. "To determine whether the record is adequate to ascertain whether a constitutional violation occurred, we must consider the respondent's alleged claim of impropriety and whether it requires any factual predicates." Id., 636.

The starting point of the respondent's argument is the proposition that due process requires a trial court to undertake a least restrictive means analysis during the adjudicative phase of a termination hearing.[10] In her briefs and at oral argument before this court, however, the respondent repeatedly used the phrases "least restrictive placement," "least restrictive permanency plan," and "least restrictive alternative" interchangeably. The respondent never defined these similar but distinct phrases. The usage was confusing; thus, we are first compelled to clarify, here.

In juvenile proceedings, there is a distinct difference between a "placement" and a "permanency plan." "Placement" refers to the temporary status of a child until such time that the court can approve a permanency plan for implementation. A placement can take a variety of forms. For example, a child can be voluntarily placed in the temporary legal and physical custody of a relative or nonrelative, or a child can be involuntarily placed in the legal custody of the petitioner, followed by a placement of the child in the physical custody of a relative or nonrelative foster parent. General Statutes § 46b-129 (d) and (j) (4). A respondent parent, relatives, and former guardians can contest a child's placement at various stages in the proceedings. For example, a respondent parent or a former legal guardian can try to change the child's placement by filing a motion to reinstate guardianship. General Statutes § 46b-129 (n) (establishing procedure for filing motion to reinstate guardianship in parent or former legal guardian). Similarly, relatives can seek to become the child's temporary custodian[11] or guardian[12] by filing a motion to intervene in the matter. See General Statutes § 46b-129 (d) (1) (A) and (B) (establishing right to file motion to intervene

for purposes of seeking temporary custody); General Statutes § 46b-129 (d) (4) (establishing right to file motion to intervene for purposes of seeking guardianship).

A "permanency plan" is the proposal for what the long-term, permanent solution for the placement of the child should be. General Statutes §§ 17a-111b (c) and 46b-129 (k). Our statutory scheme provides five permanency options: (1) reunification with a parent; (2) long-term foster care; (3) permanent guardianship;[13] (4) transfer of either guardianship or permanent guardianship; or (5) termination followed by adoption.[14] General Statutes §§ 17a-111b (c) and 46b-129 (k) (2).

If during the course of the juvenile proceedings the child is placed in the care and custody of the petitioner, as occurred in this case, the petitioner must file a motion for review of a permanency plan within nine months of that placement. General Statutes § 46b-129 (k) (1) (A). When the petitioner files a motion to review a permanency plan, the respondent parents and qualifying relatives may file a motion in opposition to the proposed plan. General Statutes § 46b-129 (k) (1) (A). If the permanency plan is opposed, the court must hold an evidentiary hearing, at which "[t]he commissioner shall have the burden of proving that the proposed permanency plan is in the best interests of the child or youth. . . ." General Statutes § 46b-129 (k) (1) (A). After the hearing, "the court shall approve a permanency plan that is in the best interests of the child . . . and takes into consideration the child's . . . need for permanency. . . ." General Statutes § 46b-129 (k) (2). If the trial court approves a permanency plan of termination followed by adoption, the petitioner "shall file a petition for termination of parental rights not later than sixty days after such approval if such petition has not previously been filed . . . ." General Statutes § 46b-129 (k) (6) (A).

With this statutory framework in mind, the most precise phrase for the policy advocated by the respondent in her brief and at oral argument before this court is "least restrictive permanency plan." This selection reflects that the respondent's argument appears to be based on a synthesis of the following propositions. Due to the recognized fundamental right of parents in the care, custody, and control of their children, strict scrutiny must be applied to termination of parental rights proceedings. Strict scrutiny requires the state to advance a compelling state interest by employing the least restrictive means available.[15] Consistent with that standard, the respondent argues that once a court determines that reunification with a respondent parent is not a viable permanency plan, it must consider whether any other permanency plan short of termination of parental rights exists that will protect the state's compelling interest in the child's best interests.[16]

It flows from the posited logic of the respondent's argument that "unless there is some valid alternative to termination, it cannot violate substantive due process to terminate parental rights. Therefore, the record must reflect whether there is a valid alternative permanency plan to termination and adoption" that adequately would safeguard the child's best interests.[17] (Footnote omitted.) *In re Azareon Y.*, supra, 309 Conn. 637, 639.

In this case, the respondent argues that granting temporary or permanent guardianship to Victor and Samantha was a less restrictive permanency plan than termination followed by adoption. Therefore, she argues that due process required the court to consider this alternative to termination followed by adoption and the petitioner to prove by clear and convincing evidence that this Victor-Samantha permanency plan was not in the best interests of Adelina. She further argues that the record is adequate to review this claim because, unlike in *In re Azareon Y.*, she did "identif[y] [this] least restrictive placement and the court did not consider that placement."

The respondent is correct that one of the deficiencies in the record in *In re Azareon Y.* was the fact that the respondent mother never represented that the relative that actually had custody of the children, the children's aunt, was amenable to either long-term foster care or permanent guardianship,[18] nor did she propose such an option to the trial court. *In re Azareon Y.*, supra, 309 Conn. 637 n.7. However, the precise reason that our Supreme Court held that the record was inadequate for review in *In re Azareon Y.* was that "there [was] an inadequate basis in the record for the trial court to determine whether there [were] *available alternatives* to termination that adequately would safeguard the children's best interests." (Emphasis added.) Id., 638–39.

There are two problems associated with the record in this case. First, there was no evidence presented at trial concerning the viability of the Victor-Samantha permanency plan. The respondent never proposed guardianship with Victor and Samantha as an alternative permanency plan,[19] nor did she, Victor, or Samantha ever file an application for permanent guardianship. While at trial Samantha testified that she and Victor would be willing to be resources for Adelina,[20] as the trial court noted in its memorandum of decision, "[i]t is unknown . . . if Victor and Samantha would have been approved for a foster care license due to his past history." See footnote 8 of this opinion. "Thus, in order to make the requisite finding [of whether there is a valid alternative permanency plan to termination], the evidence would have to be opened. In cases of unpreserved constitutional claims, [our Supreme Court] consistently has refused to order a new trial when it would be necessary to elicit additional evidence to determine whether the constitutional violation exists." *In re Azar-*

*eon Y.*, supra, 309 Conn. 639.

Second, it is unclear whether the trial court concluded that the petitioner had proven by clear and convincing evidence that termination was the only option available to satisfy the best interests of Adelina. The trial court concluded that "termination of the parental rights of mother and father as to Adelina is in the best interests of such child." As the respondent conceded at the trial and on appeal to this court, reunification was not a viable permanency plan. The dearth of evidence as to whether Victor and Samantha would have committed to, and been approved for, long-term foster care or permanent guardianship would not have precluded the trial court from reasonably concluding that termination followed by adoption was the *only* permanency plan in the best interests of Adelina.[21] "Under *State* v. *Golding* . . . '[i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the [respondent's] claim.' " *In re Azareon Y.*, supra, 309 Conn. 642.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** October 11, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The trial court also rendered judgment terminating the parental rights of the respondent father with the father's consent. Because the respondent father is not a party to this appeal, respondent in this opinion refers to Kristina D.

[2] In her brief to this court, the respondent alternatingly claimed that substantive due process requires the trial court (a) "to *consider and place* a child in the least restrictive placement that will safeguard the child" and (b) to "*consider* the least restrictive placement." (Emphasis added.) In her reply brief and at oral argument before this court, the respondent clarified that her position is that the trial court must *consider*, but is not required to place the child in, the least restrictive permanency location.

[3] Monica is also related to Adelina, as she is the cousin of Adelina's paternal grandmother.

[4] The December 24, 2014 social study for the termination of parental rights, which was entered into evidence, addressed the possibility of the respondent's half brother, Victor, being a placement resource. The report stated that "Mother reported [Victor] is unable to take on responsibility of caring for Adelina at this time. He has not contacted the Department to inquire about [Adelina] since she has been in foster care."

[5] Samantha testified at the termination hearing that she and Victor have a very distant relationship with the respondent, and they are "100 percent distanced . . . from the [respondent's] family because [Victor] knows that the more that you are around them, the more you, kind of, get sucked into that lifestyle, and he's just—has a zero tolerance policy for it, and we've, kind of, tried to keep our distance." Nevertheless, Victor and Samantha had seen Adelina occasionally prior to her removal from the respondent's care, and Victor saw her very briefly when he picked her up after the respondent was arrested in July 2013. Victor and Samantha did not have contact with her for a prolonged period after that. Samantha testified that she and Victor believed that Adelina remained in the care of Monica up until the summer of 2015.

[6] The trial concerned the termination of only the respondent's parental rights. On October 14, 2015, Adelina's father had executed a written consent to the termination of his parental rights, which the court accepted after canvassing him.

[7] The respondent did attempt to present evidence about the viability of placing Adelina with Victor and Samantha, but the court repeatedly sustained relevancy objections to this line of questioning because the only pending matter was a petition to terminate parental rights. The respondent does not challenge the court's evidentiary rulings on appeal.

[8] Victor was placed in residential treatment through juvenile parole in 1998 and was convicted of assault in the second degree in 2005. The addendum to the social study in support of the petition for termination of parental rights, which was admitted into evidence, also alluded to "substance abuse and mental health histories" in Victor and Samantha's household, but the trial court did not make any findings concerning that history in its memorandum of decision.

[9] The respondent contends that she preserved this constitutional issue for appeal by arguing at trial that termination was unnecessary because members of her own family could provide Adelina with stability and permanence and by stating her preference that Adelina be placed with Victor and Samantha. However, "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." Practice Book § 60-5. The respondent never argued at trial that substantive due process, as guaranteed by the fourteenth amendment to the United States constitution, requires (1) the trial court to consider whether there is a less restrictive permanency plan available to safeguard a child's well-being than termination of parental rights and (2) the petitioner to prove, by clear and convincing evidence, that there is no less restrictive permanency plan other than termination of parental rights. By failing to raise this constitutional issue distinctly at trial, the respondent failed to preserve it for appeal.

[10] See *In re Joseph M.*, 158 Conn. App. 849, 859, 120 A.3d 1271 (2015) ("[A] hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [parent's] parental rights is not in the best interests of the child.") (Internal quotation marks omitted.)

[11] "Any person or organization awarded the temporary custody of a minor under section 45a-607, shall have the following rights and duties regarding the minor: (1) The obligation of care and control; (2) the authority to make decisions regarding routine medical treatment or school counseling and emergency medical, psychological, psychiatric or surgical treatment; and (3) other rights and duties which the court of probate having jurisdiction may approve." General Statutes § 45a-608.

[12] A "guardian" is a person who has the authority and obligations of "guardianship," such as "[t]he obligation of care and control" and "the authority to make major decisions affecting the minor's education and welfare . . . ." (Internal quotation marks omitted.) General Statutes § 45a-604 (5) and (6).

[13] " 'Permanent guardianship' means a guardianship . . . that is intended to endure until the minor reaches the age of majority without termination of the parental rights of the minor's parents . . . ." General Statutes § 45a-604 (8).

[14] The Adoption and Safe Families Act (ASFA), Pub. L. No. 105-89, 111 Stat. 2115 (1997), and parallel state law, has established a clear preference for termination followed by adoption when reunification with a parent is not a viable permanency plan. For example, ASFA requires the petitioner to engage concurrent permanency planning from the inception of the case. 42 U.S.C. § 671 (a) (15) (F) (2012). See also General Statutes § 17a-110a. Concurrent permanency planning requires the petitioner "to identify permanent placements and prospective adoptive parents"; General Statutes § 17a-110a (b); while the department continues to make reasonable efforts to reunite the child with the parents. General Statutes § 17a-111b (outlining department's duties concerning reunification of child with his or her parent). This enables the court to commence permanent placement or adoption proceedings immediately after termination of parental rights is granted. General Statutes § 17a-110a (b). ASFA also requires the petitioner to file a petition for termination of parental rights if the child has been under the

responsibility of the state for fifteen of the last twenty-two months, subject to limited exceptions. 42 U.S.C. § 675 (5) (E) (2012); see 45 C.F.R. § 1356.21 (i); see also General Statutes § 17a-111a (a). Finally, state law requires a court to find by clear and convincing evidence that adoption is not possible or appropriate prior to issuing an order for permanent legal guardianship. General Statutes § 46b-129 (j) (6) (B).

These statutory mandates implicitly recognize that children develop attachments to the caregivers while in foster care, and they reflect the legislature's desire to shift the focus of juvenile proceedings from parental rights to the child's right to safety, stability, and permanency. See, e.g., General Statutes § 17a-110a (a) ("[i]n order to achieve early permanency for children, decrease children's length of stay in foster care, reduce the number of moves children experience in foster care and reduce the amount of time between termination of parental rights and adoption, the [petitioner] shall establish a program for concurrent permanency planning").

[15] The respondent's argument of course assumes that the strength of her fundamental rights with respect to her child is undiminished by the time of a termination hearing. "The constitutionally protected interest of parents to raise their children without interference undeniably warrants deference . . . [but] [t]here are . . . limitations on . . . parental rights. Some of these limitations arise out of an appreciation of the state's long recognized interests as parens patriae. . . . Furthermore, it is unquestionable that in the face of allegations that parents are unfit, the state may intrude upon a family's integrity." (Citations omitted; internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 395–96, 852 A.2d 643 (2004), quoting *Roth* v. *Weston*, 259 Conn. 202, 224, 789 A.2d 431 (2002). That is why our Supreme Court has held that "it is clear that a requirement of an allegation such as abuse, neglect or abandonment would provide proper safeguards to prevent families from defending against unwarranted intrusions and would be tailored narrowly to protecting the interest at stake." (Internal quotation marks omitted.) Id., 396, quoting *Roth* v. *Weston*, supra, 224. Notably, the respondent in this case was not only accused of being an unfit parent, but she was twice adjudicated unfit. Prior to the termination hearing, the court found that Adelina was neglected and, therefore, committed her to the care of the petitioner. At the termination hearing, the court found by clear and convincing evidence that the respondent "is in no position to provide the care and attention that Adelina requires."

[16] Presumably, the least restrictive alternative will be either long-term foster care or permanent guardianship with an individual that will permit the parent to interact with the child when she desires to do so. The respondent does not address procedurally or substantively how the court can consider one of these less restrictive permanency plans if an alternative permanency plan or a petition for guardianship is never filed, as occurred in this case.

[17] The respondent relied extensively on the respondent's appellate brief in *In re Azareon Y.*, and therefore, the nature of their due process claims is virtually identical.

[18] Although, the record apparently did reflect that "[t]he aunt did indicate that she was amenable to an open adoption, an arrangement that would provide the respondent with visitation, but at the aunt's discretion." *In re Azareon Y.*, supra, 309 Conn. 637 n.15.

[19] In her opposition to the petitioner's permanency plan and in her proposed orders, the respondent maintained that reunification was still a viable permanency plan. It was only in closing argument that the respondent argued that termination was unnecessary because she had family resources she could rely on to help her appropriately care for Adelina until she could successfully rehabilitate herself.

[20] Victor did not testify at the termination hearing.

[21] It is noteworthy that, at the time of the termination hearing, Adelina had resided with nonrelative foster care providers for more than one year. A court cannot issue an order for permanent legal guardianship unless the court finds by clear and convincing evidence that a statutory ground for termination of parental rights exists, adoption is not possible or appropriate, and "[t]*he child . . . has resided with the proposed permanent legal guardian for at least a year . . . .*" (Emphasis added.) General Statutes § 46b-129 (j) (6) (A) and (D). Therefore, approving a permanency plan of permanent guardianship with Victor and Samantha would have deprived Adelina of a stable and permanent placement for at least another year. For a toddler, this is a significant period of time.